Slip Op. 14 - 146

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 12-00087 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| VINH HOAN CORP., QVD FOOD CO., LTD., | : | |
| VIETNAM ASSOCIATION OF SEAFOOD | : | |
| EXPORTERS AND PRODUCERS, ANVIFISH | : | |
| JOINT STOCK CO., BIEN DONG SEAFOOD | : | |
| CO., LTD., and VINH QUANG FISHERIES | : | |
| CORP., | : | |
| | : | |
| Defendant-Intervenors. | : | |

## OPINION AND ORDER

[Remanding seventh antidumping duty administrative review of frozen fish fillets from the Socialist Republic of Vietnam.]

Dated:  December 18, 2014

*Valerie A. Slater*, *Jarrod M. Goldfeder*, and *Nazak Nikakhtar*, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington DC, for the plaintiffs.

*Ryan M. Majerus*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, argued for the defendant.  On the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of Counsel was *Elika Eftekhari*, Attorney-International, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*Matthew J. McConkey*, Mayer Brown LLP, of Washington DC, for defendant-intervenors Vinh Hoan Corporation and QVD Food Company, Limited.

*Mark E. Pardo*, *Andrew B. Schroth* , and *Andrew T. Schultz*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington DC, for the defendant-intervenor Vietnam Association of Seafood Exporters and Producers.

*Robert G. Gosselink* and *Jonathan M. Freed*, Trade Pacific, PLLC, of Washington DC, for defendant-intervenors Anvifish Joint Stock Company, Bien Dong Seafood Company Ltd., and Vinh Quang Fisheries Corporation.

Musgrave, Senior Judge:  This opinion addresses consolidated lawsuits contesting the administrative review portion of *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the Seventh Antidumping Duty Administrative Review and Sixth New Shipper Review*, 77 Fed. Reg. 15039 (Mar. 14, 2012), APDoc[1] 129 ("*Final Results*" or "*Seventh Review*").  Compiled by the defendant, International Trade Administration, United States Department of Commerce ("Commerce" or "Department"), the *Seventh Review* covers the period August 1, 2009 through July 31, 2010, and the administrative reasoning is in the issues and decision memorandum ("IDM") of record, A-PDoc 112 ("*I&D Memo*").

Previously, further proceedings here were stayed pending the results of remand of prior reviews, as those reviews implicated certain issues herein.  *See, e.g., Catfish Farmers of America v. United States*, 37 CIT ___, Slip Op. 13-63 (May 23, 2013).  Redetermination of those

---

[1]  The antidumping duty order covers *Pangasius hypophthalmus* (also identified as *Pangasius pangasius*), *Pangasius bocourti*, and *Pangasius micronemus*.  *See Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 47909 (Aug. 12, 2003) ("*Order*").  The designation "A" herein preceding this court's conventional citations to the public or confidential administrative record documents (PDoc or CDoc) are to those documents filed with the Import Administration's Antidumping and Countervailing Duty Centralized Electronic Service System ("Access").

reviews having been sustained in a separate slip opinion and judgments issued this date, the stay of this matter is lifted hereby, *sua sponte*, and the merits addressed below.

As in those prior reviews, the plaintiffs'[2] initial claims here concern Commerce's selection of Bangladesh as the primary surrogate country for the calculation of the respondents' margins, which determination also resulted in surrogate valuation ("SV") from Bangladesh of data for the factors of production ("FOPs") of the whole live fish input, farming inputs, labor, additives, diesel fuel, and packing materials, as well as the use of financial statements for certain Bangladesh shrimp processors to value foreign respondents' overhead, SG&A, and profit. In addition, the plaintiffs complain of the use of Indonesian import statistics rather than price quotes to value four by-products: fish waste, fish oil, fresh broken fish fillets, and frozen broken fish fillets.

For their part, the defendant-intervenors collectively challenge Commerce's use of "zeroing" methodology in this administrative review, and the defendant-intervenor Vinh Hoan Corporation challenges the determination to reject as untimely its request for company-specific revocation as well as the determination to "cap" the SV for its fresh broken fillets at the level of the SV for whole live fish.

Jurisdiction is pursuant to 28 U.S.C. §1581(c) and 19 U.S.C. §1516a(a)(2)(B)(iii). The court is required to examine whether the *Final Results* are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i). Certain claims on this matter persuade that remand of the case is necessary.

---

[2] The plaintiffs here again are industry petitioners Catfish Farmers of America, America's Catch, Alabama Catfish Inc., d/b/a Harvest Select Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc., d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.

*Discussion*

I.  Plaintiffs' Motion for Judgment -- Selection of Primary Surrogate Country

A.  Background

19 U.S.C. §1677b(c) mandates that the valuation of the factors of production

("FOPs") of a producer or exporter from a non-market economy ("NME") "shall be based on the best

available information regarding the values of such factors in a market economy country or

countries".  Pursuant to its interpretation thereof, Commerce normally selects a "primary" surrogate

country based on a four-step sequence. *See* Import Administration Policy Bulletin 04.1: Non-Market

Economy Surrogate Country Selection Process (Mar. 1, 2004).[3]  Only the "Data Considerations" step

in that sequence is at issue here:

> [D]ata quality is a critical consideration affecting surrogate country selection. After
> all, a country that perfectly meets the requirements of economic comparability and
> significant producer is not of much use as a primary surrogate if crucial factor price
> data from that country are inadequate or unavailable. . . .
>
> In assessing data and data sources, it is the Department's stated practice to use
> investigation or review period-wide price averages, prices specific to the input in
> question, prices that are net of taxes and import duties, prices that are
> contemporaneous with the period of investigation or review, and publicly available
> data.

*Id*.

For its preliminary determination, Commerce considered the Philippines, Indonesia,

and Bangladesh to be economically comparable to Vietnam and significant producers of comparable

merchandise, and it based the selection of the primary surrogate country on the record data for the

---

[3]  *See, e.g., Jiaxing Brother Fastener Co., Ltd. v. United States*, 38 CIT ___, ___, 961 F.
Supp. 2d 1323, 1328 (2014).

main input for production of frozen fish fillets: whole live fish.[4]  *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 76 Fed. Reg. 55872 (Sep. 9, 2011) ("*Preliminary Results*"), APDoc 7, at 55875-77.   Commerce determined the Indonesian "FAO-FIGIS" data represented a more reliable broad market average for purposes of valuing whole live fish, having also satisfied the surrogate value criteria (according to its policy) of being publicly available, from an approved surrogate country, sufficiently specific to the input in question, tax and duty exclusive, and contemporaneous with the POR.   *Id*.   Commerce also determined to reject certain DAM-internal worksheets, of the type used to calculate the whole live fish price in the final results of the prior review, on the ground that questions remained unanswered as to the worksheets' publicly availability.   *Id*. (citing DAM's failure to respond to Commerce's inquiries and an affidavit from a Bangladeshi attorney who, as a member of the public, had tried unsuccessfully to obtain a copy of the worksheets).   *See* File Memorandum, "Placing Questions to Philippine and Bangladeshi Governments on the Record" (June 27, 2011), APDoc 113.   Additionally, Commerce valued the fish waste, fish oil, fresh broken fish fillets, and frozen broken fish fillets by-products using SV import data for Indonesia.   *See* Preliminary Surrogate Value Memo, APDoc 5, at 6-7.

---

[4]  The three sources of data for these countries' respective prices for whole live *Pangasius* fish were as follows: (1) *Fisheries Statistics of the Philippines 2007-2009*, an official government publication of the Philippine Government's Bureau of Agricultural Statistics ("BAS"), Fisheries Statistics Division, containing 2009 *Pangasius* prices; (2) price and quantity data for 2009 for *Pangasius* pertaining to Indonesia from the U.N. Food and Agriculture Organization's ("FAO") Fisheries Global Information System ("FIGIS"); and (3) internal worksheets from the Department of Agriculture Marketing ("DAM") of the Bangladesh Ministry of Agriculture pertaining to price data for "pangas" at the wholesale level of distribution (the "DAM worksheets").

After the *Preliminary Results*, the parties placed further data on the record.[5]  For the

*Final Results*, Commerce changed its preliminary determination, and selected Bangladesh based on

the updated data for valuing whole live fish.  *I&D Memo* at cmt. I.C.  *See* Final Surrogate Value

Memo, APDoc 113, at 4-5.  Commerce again found the data from all three countries for that input

to be "approved", tax and duty exclusive, publicly available, specific, and contemporaneous with the

POR.  But Commerce rejected the Philippine BAS data, after adopting its "observations and

concerns" from the previous review regarding them.[6]  Commerce also found that while the FAO-

FIGIS data for Indonesian *Pangasius* are "meant to capture all encompassing whole country data",

representative of a broad-market average, and significant in volume in the amount of 109,685MT,

they are presented as a single average price for the whole country, include all four species of

*Pangasius* (of which *Pangasius hypophthalmus* is the farmed majority) and evince some uncertainty

as to total volume.

---

[5]  The additional data were as follows: (1) *Fisheries Statistics of the Philippines 2008-2010* ("*FSP08-10*"), an updated Philippine Bureau of Agricultural Statistics ("BAS") government publication, which reported farm-gate volume and value data for whole live *Pangasius* produced and sold in the Philippines during 2009 and 2010; (2) supplementation of the Indonesian FAO data; (3) printouts of weekly price data for whole "pangas" fish, covering a portion of Bangladesh's districts from the DAM website (submitted at Commerce's request, after the deadline for submitting surrogate data had already passed).  *See I&D Memo* at 6-8; *see also* VASEP's Surrogate Value Submission (Nov. 15, 2012) at Exhibit 5, APDocs 36-53; File Memorandum, "Phone Call to Counsel for VASEP" (Dec. 20, 2011), APDoc 69.

[6]  *I&D Memo* at 9.  The plaintiffs' challenges to certain of those findings and concerns were addressed in Slip Op. 13-63, *supra*.  On this point, the plaintiffs argue the adoption of prior "observations" would include Commerce's prior finding that the BAS data represented a broad market average.  The defendant argues there was no specific broad market average finding on the Philippine BAS data in the instant review, only Commerce's statement that "[a]ll other observations and concerns about the [BAS] data remain the same as in . . . prior segments".  The court, however, is inclined to agree with the plaintiffs on the import of that statement, which would include the prior administrative finding of the BAS data as constituting a broad market average.

Such observations apparently persuaded Commerce when it considered the BAS data both as a whole and in comparison with the DAM data for Bangladesh. Considering the DAM data further, Commerce continued to reject the DAM worksheets as lacking public availability. With respect to certain DAM website data submitted after the preliminary results, *see* note 5, Commerce rejected the "grower" prices that consisted of two data points as being too limited to constitute a broad market average. However, as in the prior review, Commerce was not persuaded by the domestic industry's argument that the DAM data should be rejected on the ground that they represent wholesale prices and not "farm gate" prices, reasoning that "it is uncertain the extent to which such a distinction is relevant" in SV analysis, which "seeks to determine the price a respondent would pay for an input if it were to produce subject merchandise in the surrogate country, not necessarily what producers/sellers of the input in the surrogate country receive." *I&D Memo* at 12.

Commerce then noted that the record indicated that the whole fish processed in Vietnam range from 1-1.5 kilograms and that the DAM website data for "pangash, small" consisted of fish that included that size range, *i.e.*, up to 1.5 kilograms. Commerce also noted that the terms "pangas" and "pangash" are used interchangeably, that "pangas" is the local name for *Pangasius hypophthalmus*, and that *Pangasius hypophthalmus* is the only species listed under "pangas" in the *Fisheries Statistical Yearbook of Bangladesh 2009-2010* published by the Government of Bangladesh. Commerce therefore found that the DAM website data was sufficiently species-and-size specific to the whole live fish input utilized by the respondents.

With regard to the broad market average criterion, Commerce noted that the DAM website data represented weekly prices for "only 31 of the 68 districts, [but] this still represents 767

price observations from a considerable portion of the country, a significant number" that included

the largest producing district (Mymensing), "thereby indicating that the vast majority of production

was captured."  Commerce therefore found the source to be a broad market average.

 Finally, Commerce compared the prices in the "hard copy" (*i.e.* the DAM worksheets)

to those from the DAM website and found the differences between the two "minute."  Thus,

Commerce found that:

> 1) the data are species-specific (unlike the FIGIS data); 2) this still represents 767
> price observations; 3) the largest district, by far, is included; 4) the numbers tie to the
> hard copy; 5) the data exactly match the POR; and 6) the data are publicly available.
> In addition, the *Fisheries Statistical Yearbook of Bangladesh 2009-2010*, establishes
> that cultured species-specific *Pangasius hypophthalmus*[ ] production in Bangladesh
> was 124,760MT, greater than the volume from the FIGIS data (109,685MT).
> Although we do not question the reliability of the FIGIS data, we find the DAM data
> to be a more robust data source, given its breadth and focus, especially with respect
> to specificity and contemporaneity. We thus find that the DAM data represent the
> best option for valuing the whole fish input.

*I&D Memo* at cmt. I.C (footnote omitted).  Commerce reinforced this finding by noting that

"Bangladesh also has multiple viable surrogate financial companies" for the purpose of calculating

SV financial ratios.

## B.  Analysis

 The plaintiffs advance various arguments attempting to convince that Commerce's

choice of surrogate for valuing the whole live fish input is unsupported by substantial evidence and

contrary to law.  One is sufficient for remand.

### 1

 First contended is that Commerce has imposed a new and unexplained test of

"robustness" without notice and comment or support in the record.  The court disagrees.

"Robustness" appears inherent in the statutory term "best available information," and is not a new

statistical concept. It originally referred to the sensitivity of the *method* of analysis, *i.e.*, to the degree

of resistance to errors produced by deviations from the assumptions employed, *see*, *e.g.*, Peter J.

Huber, *Robust Statistics*, ch. 1 (Wiley & Sons ed. 1981), but has since been utlized to cover the

*quality* of the data being analyzed, *cf. id.*, p. *v* ("[a]musingly, . . . 'robust' has now become a magic

word, which is invoked in order to add respectability"). Commerce in this matter simply found the

qualities of breadth and focus, as further defined in terms of specificity and contemporaneity,

compelling. The plaintiffs chip away at a selective juxtaposition of Commerce's findings of record

they deem relevant to those terms,[7] but in the end the arguments are insufficient to render

---

[7] For example, the plaintiffs argue: that Commerce has placed apparent undue emphasis on the sheer number of "data points" embodied by the DAM data; that it is unreasonable to conclude that the "higher-level" yearly average prices aggregated at the provincial levels and published in the Philippine *FSP08-10* data and the yearly total quantity and value aggregated at the national level published in the FAO data for Indonesia are any less "robust" merely because they presented fewer numbers than the lower-level district-aggregated DAM website data; that it is misleading for Commerce to attempt to bolster its case with respect to the DAM website data by referring to the 124,760MT figure for Bangladesh *Pangas* production in 2009-2010 (as reported in the *Fisheries Statistical Yearbook* prepared by the Department of Fisheries, a different government agency than DAM); that the actual DAM website data cannot compare to the data of record for Indonesia -- 109,685MT total volume of *Pangasius* production for 2009 based on FIGIS data that were specifically associated with the reported FAO data value; and that the Indonesian FAO-FIGIS data were not "overbroad" since Commerce acknowledged that *Pangasius hypophthalmus* is the majority farm-raised species and the antidumping duty order covers three of the four species of *Pangasius.* Further on this latter point, the plaintiffs argue that given the fact that the antidumping duty order covers three of the four *Pangasius* species Commerce fails to explain why a data set that underincludes two of the *Pangasius* species subject to the AD order is more "robust" for purposes of the whole live fish input SV than a data set that overincludes a single *Pangasius* species not subject to the AD order that is not the set's majority species. *E.g.*, Pls' Br. at 13 n.5, referencing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 72 Fed. Reg. 13242 (Mar. 21, 2007) and accompanying IDM (Mar. 12, 2007) at cmt. 8 (using genus-level data to value whole live fish); Pls' Reply at 8, referencing *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, (continued...)

unreasonable the administrative determination of the DAM website data as displaying "more robust" qualities than the Indonesian or Philippine data sets.  *Cf. Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974) ("a decision of less than ideal clarity" must be upheld "if the agency's path may reasonably be discerned") *with Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (court may not displace Commerce's choice between two fairly conflicting views).  Unstated in the summary paragraph in which Commerce's ultimate finding appears, but stated elsewhere, are Commerce's observations regarding the DAM website data's individuated weekly coverage of the particular size *Pangasius hypophthalmus* utilized in the respondents' production, which "lower level of aggregation" (about which the plaintiffs complain in other context) is what enabled Commerce's deeper consideration of the DAM data's "breadth" and "focus".[8]

Regarding contemporaneity, in light of Commerce's finding that every source was "sufficiently" contemporaneous, the plaintiffs' argument that the DAM website data cannot validly be determined temporally "more robust" overlooks the finding that the FAO-FIGIS data covered only 5 months of the POR.  It is not inconsistent for the agency preliminarily to find competing data sets sufficient for the purpose of further consideration, and then, upon such further consideration, to find that the coverage of one is temporally fuller, even exact, and the other less so.

---

[7]  (...continued)
75 Fed. Reg. 56062, 56067 (Sep. 15, 2010) (prelim. results) (the record did not show that using genus-level rather than species-level sources "would necessarily generate a difference in price").

[8]  Among the various definitions of "breadth", only four are apt here: (1) spaciousness or extent (distance), (2) largeness or liberality, as of views or vision, (3) the quality of having details so massed as to produce an impression of largeness and unity, and (4) in logic, the meaning of extension or denotation.  *Webster's New International Dictionary* (Unabridged) (2d ed. 1954), p. 329.  "Focus" in the context of this matter obviously means center, concentration or convergence. *See id.* p. 978.  The parties' arguments over the terms do not extend beyond such parameters.

Similarly regarding specificity, the fact that Commerce found the FAO-FIGIS data "sufficiently" specific (to the genus level) for further consideration does not mean, contrary to the plaintiffs' argument thereon, that it was unreasonable for Commerce to further find the DAM website data "more robust" in terms of its specificity or focus upon *Pangasius hypophthalmus*, *i.e.*, the specific whole live fish input utilized by respondents, and in terms of size.

As between the Bangladeshi DAM website data and the BAS data, although Commerce did not directly compare their volumes, the plaintiffs' attempt to refute the defendant's point that the total BAS volume "pales" in comparison with Bangladesh *Pangasius* production overall is insufficient to impugn the reasonableness of Commerce's "more robust" finding with respect to the DAM website data. And as between the DAM website data and the Indonesian data, the plaintiffs do not adequately explain or persuade why it was unreasonable for Commerce to have preferred a "view" of the data, in the form of weekly snapshots of district markets, as opposed to a single average price summation of them and regardless of the comparative volumes involved.

2

Nonetheless, the plaintiffs make the point that it is difficult to understand how Commerce could possibly have found the DAM data more "robust" when DAM did not respond to two separate requests from Commerce for information to clarify aspects of the worksheet data and the nature and soundness of DAM's collection procedures -- in contrast, the plaintiffs maintain, to the Philippine BAS, which they characterize as having provided a prompt and complete response to Commerce's inquiries. *See* Commerce's File Memorandum, "Response to Questions for the Philippine Bureau of Agriculture Statistics Regarding Price Data in the Fisheries Statistics of the

Philippines" (July 15, 2011), APDoc 8.  Thus returning to methodology, the plaintiffs vigorously

contest Commerce's "corroboration" of the DAM website data, arguing that Commerce ignored

significant discrepancies between those data and the unpublished internal worksheets that

undermined their reliability.  VASEP had claimed that the DAM website data may be corroborated

by comparing the percentage of matching "pangas, small" data points among the unpublished

worksheets data, which Commerce did "by comparing the instances where a field for both sources

contained data."  *I&D Memo* at 12.  Commerce "found that the numbers were identical except for

a few observations, and even then the differences between the two were minute."  *Id*.  According to

the defendant, this "enabled the agency to ascertain whether the DAM website data w[ere] indeed

sourced from the internal worksheets".  Def's Resp. at 24.  The plaintiffs contend this is cherry-

picking and faulty logic, as their analysis shows that the percentage of DAM website data fields with

varying degrees of differences, as compared with the corresponding fields of the DAM worksheets

and either containing different numbers or missing data, was over 52 percent.[9]

---

[9] In greater detail, the plaintiffs contend that the DAM wholesale price data were from "only" 31 of 68 districts in Bangladesh and provided 53 weekly price observations for the 12-month POR of August 1, 2009 through July 31, 2010.  *See* VASEP's Surrogate Value Submission (Dec. 22, 2011), at Ex. 2, APDoc 70.  Assuming steady production over time, when the plaintiffs performed the same analysis for all 32 districts for which DAM included any data, the data reported by DAM were for only for 45.2% of all weeks, so that even for the 32 of 68 (*i.e.*, 47%) of Bangladesh districts included in the DAM data, the plaintiffs point out that the data are only partial.  *See* Pls' Br. at Att. A.  In particular, the plaintiffs point out that since the DAM-reported data for Mymensingh (which Commerce claims the DAM data "covered") are for only 17 of 53 weeks of the POR, by their reckoning this means that even if the pricing in each week was representative of all production in that week, which is not known, the DAM data could, at most, account for only 32% of total POR production in Mymensingh.  This last point arguably applies with equal force to the method used to produce the BAS data, and even if all the foregoing is true, it is insufficient *on its own* to diminish the "substantiality" of the DAM website data's reliability determination on the reviewing standard before the court.  *But see infra*.

Generally speaking, the court is not free to disagree with Commerce's choice of method to confirm reliability, so long as it is based on "more than a mere scintilla" of substantial evidence to that effect. *See Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 217 (1938). And as a general proposition, determining reliability through corroboration is a valid method. *Cf.* 19 U.S.C. §1677e(c); *Watanabe Group v. United States*, Slip Op. 10-139 at 11 (Dec. 22, 2010) (corroboration simply "requires the use of independent sources to confirm the validity of [the] secondary information"). That said, the court agrees with the plaintiffs that by considering only the number of matching data fields among the DAM website data, in comparison with the DAM worksheets and notwithstanding the counter-analysis of a not-insignificant percentage of mismatches, such methodology can hardly be concluded "robust," in contrast with Commerce's expressed concern therewith. Even if it may be concluded to be "more than a mere scintilla", the *I&D Memo*'s "gloss" over the magnitude of the discrepancies between the DAM worksheets and the DAM website data, characterized as "minute," appears specious, because while it may be true that a no-public-availability finding does not, necessarily, correlate to invalidity of the same data for other purposes, the reliability determination with respect to the DAM website data appears here to rest on the thinnest of reeds that also appears considerably bent by the fact that Commerce did not "carry through" on what the plaintiffs purport as Commerce's previously-evinced concerns regarding the DAM collection methodology and the DAM's non-responsiveness thereto in determining the reliability of the DAM website data. Such concerns would seem to go beyond the DAM worksheets' public availability, and the method employed to determine the DAM website data "reliable" does not appear to have resolved the potential "GIGO" principle inherent in such method. *See*, *e.g.*,

*Mississippi v. EPA*, 744 F.3d 1334, 1352 (2013).  Remand at least for further explanation of the data's reliability in light of the above is therefore necessary, but Commerce also maintains the discretion to reconsider the matter as a whole, should it so choose.

3

The plaintiffs also argue that there are no quantities associated with the weekly wholesale prices stated on the DAM website, and that in the absence of quantities Commerce had no basis to ascertain whether the DAM data provided values for a commercial level of sales of *Pangasius* in the marketplace.  The *Final Results* do not address the plaintiffs' argument that both the Indonesian and Philippine sources provided a stated quantity associated with the average unit price and that no quantities are associated with the DAM website data.  Since the court's review function does not entail fact-finding, on remand Commerce is respectfully requested to address the plaintiffs' commercial-quantities contention in determining whether the DAM website data are the best available information.

4

On another tack, the plaintiffs also contest the *I&D Memo*'s statement that the distinction between wholesale and farm-gate levels of pricing is "uncertain" because SV "seeks to determine the price a respondent would pay for an input if it were to produce subject merchandise in the surrogate country, not necessarily what producers/sellers of the input in the surrogate country receive."  *I&D Memo* at 12.  They argue this explanation ignores the fact that the Vietnamese respondents purchased the whole live fish inputs directly from farmers and that farm-gate prices for Indonesia and the Philippines were available on the record.  The defendant responds that

Commerce's farm-gate-versus-wholesale concern is only with respect to the potential inclusion of taxes or duties and is inapplicable here because Commerce determined that the Bangladeshi wholesale data were tax and duty free.  Def's Resp at 25-26, referencing *I&D Memo* at 8 and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 75 Fed. Reg. 12726 (Mar. 17, 2010) and accompanying IDM at cmt. 2 ("one cannot decipher if the prices are derived from farm gate prices, and are therefore tax and duty exclusive, or from market prices").

If the defendant's point is true, it is *post hoc*, and the *I&D Memo*'s explanation is insufficiently responsive to the plaintiffs' concerns.  On remand of the prior administrative review, Commerce tested the idea of transportation cost as an aspect of the type of measurable and quantifiable distinction that would impact the wholesale versus farm gate price data of record for that review and found only an insignificant difference.  The plaintiffs here are not arguing that quantifiable differences can be concluded from the evidence of record; they are instead essentially arguing that Commerce should proceed from the assumption that *qualifiable* distinctions should be presumed, *e.g.*, condition of fish at wholesale versus farm-gate, in order to mirror more closely the respondents' *actual* production experience and avoid introducing pricing distortions at the wholesale level, whether or not there is actual record evidence of qualifiable distinctions.  The reviewing standard and appellate precedent might preclude imposing that kind of presumption on Commerce's methodology.  *See* 19 U.S.C. §1516a(b)(1)(B)(i); *see, e.g.*, *Nation Ford Chemical Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (Commerce need not duplicate the exact production experience at the expense of choosing a surrogate value that most accurately represents the fair market value of the input in a hypothetical market-economy).  But it would not be inappropriate to

request on remand, since remand is being ordered in any event, further explication from Commerce on the validity of the plaintiffs' concerns, summarized above, in the determination of the best available information for SV of the whole live fish input.  Commerce is therefore requested to do so.

5

Lastly on this issue, the plaintiffs argue Commerce failed to consider the totality of available data for all FOPs in its surrogate country selection.  *See*, *e.g.*, *Folding Metal Tables and Chairs from the People's Republic of China*, 76 Fed. Reg. 2883 (Jan. 18, 2011) and accompanying IDM (Jan. 10, 2011) at cmt. 1C ("consistent with the Department practice, we evaluated data considerations for the purposes of surrogate country selection as a whole, including availability of surrogate financial ratio data and availability of surrogate values for direct material inputs and other FOPS, rather than dissecting the elements").

Whenever the record includes multiple economically comparable countries that are also significant producers of comparable merchandise, "the country with the best factors data is selected as the primary surrogate country."  Policy Bulletin 04.1.  In this instance, the data sets for Bangladesh, Indonesia, and the Philippines each possess merits and demerits.  The plaintiffs do not minimize the importance of the whole live fish factor, but they argue Commerce failed to "move on" to consider the evidence of record that, they contend, demonstrated that the Philippines and Indonesia offered more contemporaneous and specific data for secondary material inputs, labor, energy, by-products, and packing materials than were available from Bangladesh.

It is merely arguable that the *I&D Memo* evinces improper *a priori* selection of Bangladesh as the primary surrogate country before consideration of the non-whole-fish factors and financial data,[10] and the court is not persuaded that the *I&D Memo*, as it stands, does not express therein or thereby a sufficient degree of consideration of the totality of available data in compliance with Policy Bulletin 04.1.[11]  For the current *Final Results*, Commerce found the data for Bangladesh to represent the best surrogate for calculating whole live fish, farming inputs, labor, additives, diesel, packing materials, overhead, SGA expenses, and profit, in accordance with its selection of Bangladesh as the primary surrogate country.  *See generally I&D Memo* at cmt. II; Final Surrogate Value Memo, APDoc 113, at 4-5.  Pursuant to 19 C.F.R. §351.408(c)(2), Commerce normally values factors in a single surrogate country if such useable information exists on the record.

Be that as it may, reconsideration of the totality of available data might be necessary depending upon how Commerce proceeds on remand in further explaining or redetermining the best available information for the whole live fish SV, which would implicate the non-fish FOP SV

---

[10]  *Cf. I&D Memo* at 15 (regarding financial ratios, "[a]s noted above in Comment I, we have selected Bangladesh as the primary surrogate country"), & *id*. at 21 (regarding fish meal, "[a]s we explained in Comment I above, we have selected Bangladesh as the primary surrogate country"), & *id*. at 21 (regarding fingerlings, *etc*., "[w]e have selected Bangladesh as the primary surrogate country"), *with* Slip Op. 13-63 at 34 (remanding for consideration the impact of the secondary factors upon the determination of surrogate country as a whole, along with the court's concerns over Commerce's interpretation of the DAM and Philippine data submitted for that review, since *a priori* determination was not in accordance with Policy Bulletin 04.1).

[11]  *See I&D Memo* at 13 ("As described above, the Bangladeshi DAM data offer the best option for valuing the whole fish.  Moreover, Bangladesh also has multiple viable surrogate financial companies as discussed below. Therefore, given the totality of the facts, we find that Bangladesh is the most suitable primary surrogate. Both Indonesia and the Philippines are suitable secondary surrogate countries."); *see also id*. at 14-17 (financial ratios).

selections since the ultimate selection of the primary surrogate country has not yet been finally

resolved.  Certain issues pertinent thereto are more fully addressed in the following section.

II.  Plaintiffs' and Vinh Hoan's Motions for Judgment --
Surrogate Valuations of By-products

When calculating normal value, Commerce interprets 19 U.S.C. §1677b(c) to permit

offsetting incurred production costs with SVs calculated for by-products generated during the

production process,[12] which interpretation the parties do not dispute.  The *I&D Memo* restates: that

it is Commerce's preference to value all FOPs with data from the primary surrogate country; that

when data are not available from the primary surrogate, Commerce will look to secondary sources;

and that Commerce declines to use  price quotes when other "more reliable" data are on the record.[13]

---

[12] Selection of the best available information of record for valuing by-products focuses on yielding accurate dumping margins.  *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Commerce's stated practice is to evaluate data for reliability, public availability, quality, specificity, and contemporaneity.  *See Magnesium Metal from the People's Republic of China*, 69 Fed. Reg. 59187, 59195 (Oct. 4, 2004) (preliminary determination); *see also* 19 C.F.R. §351.408(c)(1).  Of those considerations, specificity has been held of primary importance for surrogate by-product valuation.  *See, e.g.*, *Jinan Yipin Corp. v. United States*, 35 CIT ___, ___, 800 F. Supp. 2d 1226, 1304 (2011) ("[i]f a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria"); *see also Taian Ziyang Food Co. v. United States*, 35 CIT ___, ___, 783 F. Supp. 2d 1292, 1330 (2011) ("'product specificity' logically must be the primary consideration in determining 'best available information'" and "[i]f a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1") (citation omitted).

[13] *See, e.g.*, *I&D Memo* at 18, referencing *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam,* 74 Fed. Reg. 47191 (Sep. 15, 2009) (final results) ("*Frozen Warmwater Shrimp*") and accompanying IDM at cmt. 7 (Commerce's "general practice is to not use price quote information if other publicly available data is on the record, because [price quotes] do not represent actual prices, broad ranges of data, and [Commerce] does not know the conditions under which these were solicited and whether or not these were self-selected from a broader range of quotes").   The defendant also argues Commerce's reasons for selecting the Indonesian data correlate with the agency's long-standing practice with regard to surrogate price data: Commerce prefers to use surrogate price data that is (1) an average non-export value, (2) representative of a

In the final analysis, Commerce granted SV offsets for respondents' fish waste, fish oil, fresh broken fillets, and frozen broken fillets by-products using import data maintained in the Global Trade Atlas ("GTA") for Indonesia from the Harmonized Tariff Schedule ("HTS").  *See I&D Memo* at cmt  II.B.

The plaintiffs contest each by-product SV selection, arguing that the selected SVs are demonstrably aberrant, both in absolute terms and relative to the value for the whole live fish input, because they significantly overstated the by-product offset, thus rendering the margin calculations inaccurate and unreasonably reduced.  More precisely, the plaintiffs complain that the Indonesian import data are far less specific to *Pangasius* by-products than the available price quotes, and that Commerce unreasonably cites merely to its preference for import statistics without further explanation, which they claim is legally defective because it presupposes that price quotes will never constitute the "best available information" for valuing a reported factor of production contrary to established judicial precedent.  Vinh Hoan contests Commerce's treatment of its fresh broken fillets, and it also raises an imprecise point regarding Commerce's treatment of the fresh broken fillets in their frozen state.  With the caveat that Commerce's response to section I, *supra*, might necessitate, in its discretion, a reconsideration of these by-products' SV, the court offers the following observations.

1.  Unprocessed Fish Waste

Agreeing with Vinh Hoan that Indonesian GTA data for HTS 0511.91.90.00 appeared to be the more specific evidence of record to value fish waste on the ground that the provision does

---

range of prices within, and contemporaneous with, the POR, (3) product-specific, and (4) tax-exclusive.  Def's Resp. at 30.  *See Taiyuan Heavy Machinery Import & Export Corp. v. United States*, 23 CIT 701, 706 (1999); *accord Hebei Metals & Minerals Import & Export Corp.*, 28 CIT 1185, 1191 (2004).

not include whole fish, Commerce valued respondents' unprocessed fish waste thereby, to wit, "Animal Products Nesoi[14]; Dead Animals (of Ch. 3), Unfit for Human Consumption, Other Products of Fish or Crustaceans, Moluscs or Other Aquatic Invertebrates." *I&D Memo* at cmt. II.B.1. In so doing, Commerce rejected a 2010 commercial price quote for *Pangasius* fish waste from Vitarich, a Philippine *Pangasius* processor,[15] two 2006 price quotes from Indian companies Aditya Udyong and Ram's Cold Storage,[16] and four published Indonesian prices for unprocessed fish waste or other seafood waste products.  Commerce rejected the plaintiffs' argument that the import statistics are overly broad, and it did "not find the price quotes to be any more specific" because, among the several general price quotes provided by the plaintiffs for fish waste from India, Indonesia, and the Philippines, only the Vitarich quote was species specific -- and even then, Commerce did not "believe that the species from which the fish waste originated is necessarily important because there is no information on the record indicating there are meaningful distinctions among the species".  Commerce also found only two of the price quotes contemporaneous, which the defendant contends were from among the Indian price quotes.

Contending that these findings are at odds with the record, the plaintiffs contest Commerce's finding that the price quotes were not "any more specific" than the import statistics because the Philippine, Indian, and Indonesian price quotes are all specific to unprocessed fish waste,

---

[14] *I.e.*, "not elsewhere specified or included."

[15]  Use of this quote in the prior review was sustained on appeal here.

[16]  Use of these quotes in a prior new shipper review, covering the period August 1, 2006 through January 31, 2007, was sustained in *Vinh Quang Fisheries Corp. v. United States*,  33 CIT 1277, 637 F. Supp. 2d 1352 (2009).

and the Vitarich quote was also species specific (as Commerce itself acknowledges).    After

considering the plaintiffs' various contentions, the court is persuaded as to the correctness[17] of their

argument that HTS 0511.91.90.00 is a "catch-all" provision for aquatic invertebrates that is not

facially restricted to species' "waste".  Therefore, it was erroneous for Commerce to have articulated

that the price quotes were not "any more specific" than the import statistics for valuing fish waste,

because that statement proceeds from either *ipse dixit* or circular reasoning that the import data for

that provision are "other more reliable data . . . on the record".  *See I&D Memo* at 18.

             In addition, the plaintiffs argue that continuing to use Indonesian HTS 0511.91.90.00

import-statistics to value the fish waste at $0.59/kg after Commerce switched the primary surrogate

country from Indonesia to Bangladesh resulted in a near-doubling of the relative fish-waste-to-

whole-live-fish-input ratio, from 33% to 60%.  *See* Final Surrogate Value Memo (Mar. 7, 2012) at

Exhibit 1, APDoc 113.  The plaintiffs' evidence of record indicates that fish waste is a wholly

unprocessed by-product that is collected from the factory floor and sold to local buyers for a nominal

(and, the plaintiffs argue, more realistic) amount between $0.01/kg to $0.09/kg, according to their

---

[17]  The court finds the other arguments raised by the plaintiffs on this issue less persuasive.
They contend, for example, that Commerce acknowledged from the prior *Sixth Review* that "the
import statistics in question" -- meaning those pertinent to this review -- include products other than
unprocessed fish waste, particularly processed by-products.  Pls' Br. at 32, referencing *Sixth Review
I&D Memo* at cmt. IV.I.i.  The argument fails because those "import statistics in question" were with
respect to HTS 0304.90 (other fish meat of marine fish) for the Philippines, not HTS 0511.91.90.00
import statistics for Indonesia.  (Commerce rejected Philippine HTS 0304.90 during remand of that
issue from the *Sixth Review* because "valuing fish waste using import statistics results in a fish waste
SV which is higher than that of the whole fish"; *Sixth Review* Remand Results at 19.)  A second
argument that fails is that Commerce needs to explain with greater clarity its "divergence" from *Vinh
Quang Fisheries* and other cases.  Commerce's statement that there was "no information on the
record" as to any difference in species' waste provides a reasonably clear explanation for departing
from (or the inapplicability of) its general requirement of "prices specific to the input in question"
in Policy Bulletin 04.1.

recitation of SVs from each of the other potential surrogate countries and the independent research studies on fish waste values in the Asia-Pacific region they submitted for the record. *See* Petitioners' Case Brief at 25-34, APDoc 83; *see also Certain Fresh Cut Flowers from Colombia*, 61 Fed. Reg. 42833 (Aug. 19, 1996) (final results) at cmt. 25 ("the distinguishing feature of a by-product is its relatively minor sales value in comparison to that of the major product or products produced"). No party points to any contradictory evidence of record. The plaintiffs argue such a pricing disparity to the Indonesian import data is obvious indication of inclusion of higher-priced value-added products among those data, and therefore reliance on them is inappropriate because the result is improper assignment of an inflated value to the input in question and an inaccurate antidumping calculation. *See*, *e.g.*, *Globe Metallurgical Inc. v. United States*, 32 CIT 1070, 1079 (Oct. 1, 2008).

The defendant responds that Commerce reasoned that the Indonesian data were "preferable" to the competing price quote data in the record for valuing the fish waste by-product because: (i) only one price quote on the record was species specific; (ii) only two price quotes were contemporaneous; (iii) the Indonesian import statistics reflected broad market averages; and (iv) the Indonesian import statistics were more specific to fish waste because they did not include whole fish. Def's Resp. at 30. With the possible exception of contemporaneity, however, and about which Commerce barely commented, none of these reasons actually impugns the price quotes' reliability, since Commerce itself took the position that the record evinced no distinction among the waste of "species".

Obviously, an administrative preference for a particular kind of data must yield if the relevant facts of record so compel. It would be unreasonable, for example, to continue to "prefer"

import data simply on the basis of their breadth if they are in fact overinclusive or overvaluative in relation to the specific circumstances of the input or by-product in question.  *See, e.g.*, *Jinan Yipin Corp.*, *supra*, 35 CIT at ___, 800 F. Supp. 2d at 1304 ("[i]f a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other [SV] criteria").[18] And with respect to any substantial evidence of record that calls into question continued reliance on the administrative preference, Commerce needs to reasonably resolve the conflict, because administrative determinations must be explained "with sufficient clarity to permit 'effective judicial review'" as a matter of law.  *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. 29, 43; *see, e.g.*, *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005).  The function of the court, of course, is not to weigh the evidence, but to determine whether the agency has reasonably considered the record.  On that basis, this record needs deeper articulation.  Whatever the appeal of certain import data in meeting the "broad market" criterion, Commerce needs to explain why they are not overinclusive and more reliable than other information of record for the SV valuation of the *Pangasius* by-product in question beyond merely providing a conclusory statement that they are, particularly if the import data's HTS provision is facially overbroad, which appears to be the case here.  Otherwise, this aspect of the *Final Results* simply rests on the fallacy of *argumentum ad populum*.

---

[18]  *See also*, *e.g.*, *Vinh Quang Fisheries, supra*, which sustained Commerce's reliance upon the two Indian price quotes on the record pertinent to that review.  After throughly detailing the background and proposed alternatives for valuing the fish waste considered in that decision, the court observed that the respondent in that case "never c[ame] to terms with Commerce's finding that [the respondent]'s alternative processed fish waste data were an inappropriate match for the *unprocessed* fish waste factor."  33 CIT at 1282, 637 F. Supp. 2d at 1357 (italics in original).

More precisely, Commerce in this instance did not comment on what the Indonesian GTA data for HTS 0511.91.90.00 actually encompasses beyond accepting Vinh Hoan's contention that it does include fish waste.  Commerce only indicated its preference is not to use price quotes "when other more reliable data [are] on the record", but that still begs the question, and Commerce provided little else by way of analysis on the reliability of the Philippine, Indian, or Indonesian price quotes, or on the evidence of record on other fish waste prices pertinent to the Indonesian region *vis-à-vis* the import statistics in question, or on the arguments set forth by the plaintiffs regarding satisfaction of the SV selection criteria.  *See* Petitioners' Case Brief at 23-34, APDoc 83.  Still, approximately eighteen years ago Commerce articulated that "the distinguishing feature of a by-product is its relatively minor sales value in comparison to that of the major product or products produced." *Certain Fresh Cut Flowers from Columbia*, 61 Fed. Reg. 42833 (Aug. 19, 1996) (final admin. results), at cmt. 25.  *See also* Charles Horngren, George Foster, *Cost Accounting: A Managerial Emphasis* (7th ed. 1991), p. 527 ("[a] by-product is a product that has a low sales value compared with the sales value of [the principal product]").  Although there may be instances where a process that produces waste to the degree implicated by the SV of the waste by-product calculated for the *Final Results* may not seem unreasonable, an SV for "fish waste" that amounts to 60% of the SV for the primary input of a process rather leaves a difficult bone of contention to swallow, and at least requires Commerce to "explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken*, 421 F.3d at 1355.  Further explanation thereof is therefore requested in addition to the foregoing.

2.  Fish Oil

Commerce's valuation of the respondents' fish oil by-product suffers from similar defect.  In rejecting the *Pangasius*-specific price quote in favor of import statistics, Commerce again stated only that it has "a preference not to use price quotes when other data is available" and that "this HTS category includes fish oil and is therefore[ ] not overly broad." *I&D Memo* at 19. Commerce thus valued the fish oil using Indonesian GTA data for HTS 1504.20: "Fish Fats & Oils & Their Fractions Exc Liver, *Refined* or Not, Not Chemically Mod., solid fractions, not chemically modified, other" (italics added).

Similar to its fish waste SV, *supra*, Commerce's SV calculation of $1.95/kg for fish oil using Indonesian import data represents nearly double the price of the whole fish input, using the plaintiffs' calculation.[19]  *See* Final Surrogate Value Memo (Mar. 7, 2012) at Exhibit 1, APDoc 113. The fact that HTS 1504.20 facially covers refined and further-processed fish oil is at odds with the administrative record of respondents' unprocessed fish-oil by-product and of the respondents' actual production experience, as well as at odds with Commerce's position in *Vinh Quang Fisheries*, albeit as argued in the context of fish waste.  As mentioned, specificity has been held of primary importance in determining whether particular import statistics are even appropriate for surrogate valuation.  *See, e.g.*, *Jinan Yipin Corp.*, *supra*, 35 CIT at ___, 800 F. Supp. 2d at 1304.

The plaintiffs further add that Commerce also failed to respond to their various arguments that the respondents only sold their fish oil in the domestic market, that the record contains a reliable and specific price quote for unprocessed *Pangasius* fish oil from an Indonesian supplier, Yahdi, and that record evidence shows that *Pangasius* fish oil prices in Indonesia and India

---

[19]  At such valuation, one wonders whether fish fillet or fish oil is the primary product.

ranged from $0.13/kg to $0.84.  *E.g.*, Pls' Br. at 34 referencing Petitioners' Case Brief at 26-29,

APDoc 83.  In view of such unresolved questions, Commerce's determination here has also not been

explained with sufficient clarity to permit "effective judicial review," thus requiring remand.  On

remand, also bearing in mind the plaintiffs' averment that the combined effect of Commerce's fish

waste and fish oil surrogate valuations adds over 150% of the cost of the whole fish input, if

Commerce continues to value the unprocessed fish waste and fish oil by-products using Indonesian

import statistics or any other similar such import statistics, it shall clearly explain why any such

elevated results, as compared with the whole fish input, are reasonable for fish waste and fish oil by-

products, and also briefly explain how, or if, its views have evolved since *Fresh Cut Flowers*.

3.  Fresh Broken Fillets

Commerce valued the respondents' fresh broken fillets "by-product" based on

Indonesian GTA data for HTS 0304.19.00.00 "Fish Fillets and Other Fish Meat (Whether or Not

Minced), Fresh, Chilled or Frozen, Fresh or Chilled, Other".  *I&D Memo* at 20.  Those data produced

a value of  $2.89/kg value for the broken fillets.  But, because "[b]roken fillets are not value added

by-products, they are simply meat from the fish that is broken or torn", Commerce "capped" the

fresh broken fillets at the value for whole live fish of $0.98/kg, reasoning that it is illogical to

generate a deduction from normal value that is higher than the value of the whole live fish input.

*I&D Memo* at 20.  *See also* Final Surrogate Value Memo (Mar. 7, 2012) at Exhibit 1, APDoc 113.

The plaintiffs contest this determination on the ground that the record contained, in

their opinion, contemporaneous, reliable, *Pangasius*-specific, Philippine price quotes from Vitarich

of $0.65/kg for broken *Pangasius* meat.  *See* Petitioners' Surrogate Value Submission (May 10,

2011) at Exhibit 16, PDoc 101; *see also* Petitioners' Rebuttal Brief at 95-97 (Jan. 27, 2012), APDoc

93.  In the context of Commerce's repeated preference for import statistics over price quotes, the

plaintiffs argue that Commerce did not find their Vitarich price quote to be unreliable as a source for

valuing fresh broken fillets, and that Commerce failed to address their arguments that the import

statistics were "clearly aberrational" because they included values for both by-products and the

finished frozen fish fillets, a fact Commerce implicitly recognized insofar as it "capped" the value

for broken fillets derived from this HTS category at the $0.98/kg value for whole live fish.

Vinh Hoan contests the determination to "cap".  It argues that fresh broken fillets are

indeed value-added products that take labor, energy, equipment and other resources to produce and

are rendered "more valuable" than the unprocessed whole fish from which they have been produced.

Vinh Hoan also contests Commerce's conclusion that Vinh Hoan cannot sell fresh broken fillets as

frozen fish fillets because of their appearance on the ground that Commerce failed to cite any

evidence in the record to support this factual assertion.  The defendant responds that this is

contradicted by the record itself, specifically, Vinh Hoan's questionnaire response.  Def's Resp. at

35-36, referencing *I&D Memo* at 20 n.62 and Vinh Hoan's Supplemental Section D Response, PDoc

99, Question 23 ("[t]he company confirms that other than fish oil and fish meal, there were no other

value added by-products").

The court need not opine on the issue at this point, since Commerce needs to resolve

in the first instance whether this issue will need revisiting as a result of the remand of the whole live

fish input and selection of primary surrogate country issues.

4.  Frozen Broken Fillets

Commerce valued the respondents' frozen broken fillets with Indonesian GTA data for HTS 0304.29.00.00 "Fish Fillets and Other Fish Meat (Whether or Not Minced), Fresh, Chilled or Frozen, Fresh or Chilled, Frozen Fillets, Other." *I&D Memo* at 20.  In selecting Indonesian import statistics, Commerce stated that no party other than Vinh Hoan (*et al.*) commented on "this issue." *Id*.  The plaintiffs argue they "clearly" addressed the issue of frozen broken fillets in their rebuttal brief in advocating for the use of Vitarich price quotes to value this by-product, *see* Petitioners' Rebuttal Brief at 95-97, PRII-93, and the defendant responds that the *I&D Memo* statement that "[n]o other party commented on this issue" referred to the issue of whether to value frozen broken fillets using HTS category 0304.29.00.00 or another Indonesian HTS category -- not whether the Philippine price quote should be used to value the by-product. *I&D Memo* at 20. Vinh Hoan does not appear to contest Commerce's choice of SV for frozen broken fillets, but it does take exception to Commerce's treatment of its fresh broken fillets in their frozen state, as aforesaid.

At any rate, the court again need not opine at this point, since Commerce needs to resolve in the first instance whether this issue will need revisiting as a result of remand of the whole live fish input and selection of primary surrogate country issues.

### III.  Plaintiffs' Motion for Judgment -- Partial Adverse Facts re Vinh Hoan

Commerce also found that Vinh Hoan had not misrepresented its consumption of whole fish in the production of subject merchandise during the period of review. *I&D Memo* at 35-36.  Commerce determined that Vinh Hoan's reporting methodology was reasonable, that Vinh Hoan had provided reasonable explanations as to why its fish consumption ratio might have decreased relative to the last review, and that the record did not support plaintiffs' claim that Vinh Hoan understated its fish consumption.  *I&D Memo* at 13.

The plaintiffs argue record evidence demonstrates the contrary, that Vinh Hoan misreported its whole fish consumption factor and failed to substantiate the reasons for the reported decline in its whole fish consumption factor, and therefore Commerce erred in determining not to apply partial adverse facts available to Vinh Hoan pursuant to 19 U.S.C. §1677e. Pls' Br. at 39. According to the defendant, Commerce properly considered Vinh Hoan's explanations for the decline in its whole fish consumption ratio, the lack of record evidence demonstrating underreporting by Vinh Hoan, and the satisfactory reconciliation of Vinh Hoan's total quantity of fish entered into production with its financial statements. *Id*. Thus, the defendant argues, Commerce properly determined that the record did not demonstrate the need for application of 19 U.S.C. §1677e.

The court agrees with the defendant that the plaintiff's estimations of underreporting are speculative and do not constitute direct record evidence demonstrating that Vinh Hoan misrepresented its whole fish consumption. *See* Pls' Br. at 41-44. The criticism that Commerce did not conduct a verification in the underlying review, *see id*. at 44, is unavailing because by statute Commerce does not have to verify every review. *See* 19 U.S.C. §1677m(i)(3) (noting verification of a final determination in an administrative review is only required when timely requested by an interested party and when no verification was made during two immediately preceding reviews, unless good cause for verification is shown).

In considering Vinh Hoan's explanations for the decline in its reported whole fish consumption factor from the preceding review, Commerce noted that although plaintiffs had challenged each of Vinh Hoan's explanations individually, "Vinh Hoan counters that collectively [the explanations] account for the decline." *I&D Memo* at 35. Commerce further observed that although Vinh Hoan did not submit detailed record evidence tying each explanation to an "exact

percentage" of change, nevertheless, "when taken together, these explanations appear reasonable, particularly in light of Vinh Hoan's reconciliation [of its total fish entered into production with its audited financial statements]."  *Id.* at 36.  Commerce also rejected the speculative nature of plaintiffs' assertion that Vinh Hoan understated its fish consumption, noting that "[t]he record does not contain any evidence of underreporting."  *Id.*

Although the plaintiffs allege that Vinh Hoan failed to substantiate with documentation the reasons for the decline in its whole fish consumption ratio, Pls' Br. at 38-39, Commerce did not require Vinh Hoan to submit such documentation in responding to its supplemental questionnaire.  *See* Commerce's Supplemental Questionnaire to Vinh Hoan, APDoc 77 ("[p]lease explain what may have caused the total fish consumption ratio to decree . . . between this review and the last").  The plaintiffs' claim that Commerce "accepted [Vinh Hoan's] explanations simply because they 'appeared reasonable'", Pls' Br. at 40, appears to be an oversimplification of the analysis applied by Commerce.  That is, the plaintiffs attempt to create the appearance that Commerce simply accepted Vinh Hoan's reported whole fish consumption factor based on Vinh Hoan's individual explanations rather than consider their collective weight, *see* Pls' Br. at 40-41; however, it appears that Commerce based its decision on the totality of the evidence, and therefore the determination not to apply partial facts adverse facts to Vinh Hoan pursuant to 19 U.S.C. §1677e is supported by substantial evidence and is hereby sustained.

IV.  Defendant-Intervenors' Rule 56.2 Motions

Vinh Hoan, QVD Food Company, Ltd., and collectively Anvifish Joint Stock Company, Bien Dong Seafood Company, Ltd., and Vinh Quang Fisheries Corporation, filed separate motions for judgment appealing Commerce's application of zeroing methodology in the *Final*

*Results*.  Vinh Hoan's motion also contests Commerce's rejection of its request for revocation of the review as well as Commerce's determination to cap the surrogate value for Vinh Hoan's fresh broken fish fillets at the surrogate value for whole live fish.  Anvifish's motion also alleges that Commerce failed to calculate Anvifish's margin as accurately as possible.

A.  Vinh Hoan's Motion for Judgment -- Revocation Request

Commerce rejected a request for revocation from Vinh Hoan because the request was filed 232 days after the regulatory deadline established in 19 C.F.R. §351.222(e), stating that revocations "require additional analysis beyond the requirements of an administrative review, including conducting verification, and determining if sales of subject merchandise were made in commercial quantities."  *I&D Memo* at 37.  *See* Vinh Hoan's Request for Revocation, PDoc 89; *Preliminary Results*, 76 Fed. Reg. at 55873.  Commerce noted that interested parties must be allowed an opportunity to comment on the preliminary results of the agency's revocation analysis, *id*., and it distinguished the cases cited by Vinh Hoan, specifically stating that its determination to reject the revocation request was based on considerations of fairness and accuracy. *Id*.

The defendant contends that Commerce acted reasonably and consistently with its regulations and that Vinh Hoan has failed to demonstrate that Commerce's rejection of the revocation request was not supported by substantial evidence or an abuse of discretion and not in accordance with law.  *See* Vinh Hoan Br. at 8-24. Although Vinh Hoan claims that Commerce abused its discretion in "fail[ing] to address" Vinh Hoan's fairness and accuracy arguments, Commerce, in rejecting the untimely request, determined that the request was not fair to the other parties and the agency.  Vinh Hoan has also failed to demonstrate that its 232-days late submission

is factually analogous to the five-day delay in *Carbon Steel Flat Products* and the timely submission in PET Film from Korea. *See I&D Memo* at 38; Vinh Hoan Br. at 21-23 (citing *Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada*, 64 Fed. Reg. 2173 (Jan. 13, 1999); *Polyethylene Terephthalate Film from Korea*, 61 Fed. Reg. 36032 (July 9, 1996)).

Vinh Hoan's brief appears to blur the distinction between the submission of factual information and the submission of a revocation request. With the sole exception of *NSK Corp. v. United States*, 33 CIT 1185, 637 F. Supp. 2d 1311 (2009), which Vinh Hoan cites for the general proposition that Commerce must consider "an important aspect of the problem," none of the cases cited in Vinh Hoan's brief involve revocation requests. *See* Vinh Hoan Br. at 8-24.[20] Rather, the cases upon which Vinh Hoan relies concern the timeliness of factual information submissions under 19 C.F.R. §351.301, not revocation requests made under 19 C.F.R. §351.222, and the court previously recognized the "significant distinction" between Commerce's administration of the two provisions in upholding Commerce's interpretation of the predecessor to 19 C.F.R. §351.222(e) as a "mandatory, bright line rule requiring that a producer submit its revocation request during the anniversary month of an antidumping duty order." *Samsung Electronics Co. v. United States*, 20 CIT 1306, 1310, 946 F. Supp. 5, 9 (1996), *aff'd*, 129 F.3d 135 (Fed. Cir. 1997). *See also Exportaciones*

---

[20]   The other cases cited in Vinh Hoan's brief for its proposition include the following: *Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006); *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995); *Grobest & I-Mei Industrial (Vietnam) Co. v. United States*, 36 CIT ___, 815 F. Supp. 2d 1342 (2012) ("*Grobest I*"); *Fischer S.A. v. United States*, 34 CIT ___, 700 F. Supp. 2d 1364 (2010); *Yantai Timken Co. v. United States*, 31 CIT 1741, 521 F. Supp. 2d 1356 (2007); *Maui Pineapple Co. v. United States*, 27 CIT 580, 601, 264 F. Supp. 2d 1244, 1262 (2003); *Usinor Sacilor v. United States*, 18 CIT 1155, 872 F. Supp. 1000 (1994).

*Bochica/Floral v. United States*, 16 CIT 670, 671, 802 F. Supp. 447, 448 (1992) (sustaining Commerce's decision not to consider an untimely revocation request), *aff'd*, 996 F.2d 317 (Fed. Cir. 1993).

In addition to the distinction between factual information and revocation requests, the cases Vinh Hoan cites are factually distinguishable from the present proceeding. Vinh Hoan relies heavily on *Grobest I*, *see* Vinh Hoan Br. at 9, 12, 14, 19, however that case involved a separate rate certification that was 95 days late, unlike the 232-day late request for revocation in this case.  The decisions in *Maui Pineapple Co.* and *NTN Bearing Corp.*, *see* Vinh Hoan Br. at 12, are also distinguishable because both involved minor clerical errors, not a revocation request.  *See Maui Pineapple Co.*, 27 CIT at 599, 264 F. Supp. 2d at 1261 ("the number of cans per case for product code 38900-72475 was mistakenly listed as eight rather than four and the conversion factor . . . was incorrectly indicated as 0.33"); *NTN Bearing Corp.*, 74 F.3d at 1207-08 ("[f]or 23 U.S. sales, one digit in a 13-digit code . . . was entered incorrectly into the database . . . [and] NTN . . . had mistakenly included in its U.S. sales database four sales which were actually sales to a Canadian, not a U.S., customer").

Vinh Hoan's discussion of Commerce's consideration of other revocation requests, *see* Vinh Hoan Br. at 10-12, is not relevant, because the circumstance at bar involves Commerce's receipt of what the defendant not unreasonably characterizes as "an extremely untimely request". Def's Resp. at 41. Moreover, in light of the uniqueness of each review, *see*, *e.g.*, *Peer Bearing Co.-Changshan v. United States*, 32 CIT 1307, 1310, 587 F. Supp. 2d 1319, 1325 (2008), Vinh Hoan's references to facts and determinations in the eighth administrative review, Vinh Hoan Br.

at 16, 18-19, are not germane to determining the reasonableness of Commerce's findings in the present review. Further, Vinh Hoan's assertion that conducting a verification would not have created any undue burden for Commerce is unconvincing because "[i]t is not the role of the court to second guess Commerce's allocation of its resources. Any assessment of Commerce's operational capabilities or deadline rendering must be made by the agency itself." *Grobest & I-Mei Industrial (Vietnam) Co. v. United States*, 36 CIT ___, ___, 853 F. Supp. 2d 1352, 1362-63 (2012) (*Grobest II*) (citation omitted); *see also Samsung Electronics Co. v. United States*, 20 CIT 1306, 1309-10, 946 F. Supp. 5, 9 (1996) ("In response to a request for revocation, Commerce must initiate and conduct an entire investigation . . . . If the plaintiff could command Commerce to conduct such an investigation at its whim rather than only once per year, Commerce's administrative efficiency would be adversely affected.") (citation omitted).

Citing *Grobest I*, 36 CIT at ___ n.36,  815 F. Supp. 2d at 1366 n.36, Vinh Hoan claims that the rejection of its revocation request would work a substantial hardship on the company because of the costs associated with its participation in the proceeding. Vinh Hoan Br. at 12-13. But it is well-settled that ordinary participation in administrative proceedings is not a "substantial hardship" or a "draconian penalty," despite claims to the contrary. *See* Vinh Hoan Br. at 13; *see also Daido Corp. v. United States*, 16 CIT 681, 685, 796 F. Supp. 533, 537 (1992) ("[o]rdinary burdens and expenses associated with antidumping procedures . . . do not constitute irreparable injury") (internal quotation omitted); *Matsushita Electric Industrial Co. v. United States*, 823 F.2d 505, 509 (Fed. Cir. 1987) (finding of irreparable injury was "clearly erroneous" when based on "having to comply with Commerce's demands for data and verification" because "ordinary consequences of

antidumping duty procedures do not constitute irreparable harm") (internal quotation marks omitted);

*Nissan Motor Corp. v. United States*, 10 CIT 820, 823, 651 F. Supp. 1450, 1454 (1986) ("[w]hile

this Court can appreciate that plaintiffs seek to avoid the expenditure of time and resources which

may ultimately prove unnecessary, this cannot be equated with the threat of immediate and

irreparable harm").  As such, Vinh Hoan has failed to show that Commerce's rejection of its

untimely revocation request was an abuse of discretion or otherwise improper.

B.  Defendant-Intervenors' Motions for Judgment -- "Zeroing"

In the *Final Results*, when comparing the respondents' normal value and net United

States price for purposes of calculating dumping margins, Commerce used the "AT"

(average-to-transaction) comparison method that included the use of zeroing. Under zeroing

methodology, for each control number or "CONNUM,"

> Commerce uses the average normal value and on a month-to-month basis compares
> it to the individual United States transaction prices in that month. If the result is a
> transaction which is not dumped, *i.e.*, there is no margin, Commerce sets the margin
> for that transaction at zero.  Nonetheless, the sale price for the transaction goes into
> the denominator in calculating the final weighted-average dumping margin
> percentage, thereby lowering the percentage margin.

*Union Steel v. United States*, 36 CIT ___, ___, 823 F. Supp. 2d 1346, 1350 (2012) (internal citations

and footnote omitted), *aff'd*, 713 F.3d 1101 (Fed. Cir. 2013).  Commerce did not alter these findings

in the *Final Results*.  *See I&D Memo* at 27-34, 37-38.

Vinh Hoan, QVD, and Anvifish argue that Commerce acted unlawfully when it used

its zeroing methodology to calculate the final dumping margin in this case because Commerce

employed contradictory interpretations of the same statute (*i.e.*, for the review as compared with

Commerce's abandonment of that practice in investigations).  *See* Vinh Hoan Br. at 26-31; QVD Br.

6-11; Anvifish Br. 6-19.  The court disagrees.  Commerce provided the same kind of detailed and

reasonable explanation for its interpretation of 19 U.S.C. §1677(35) as permitting the application

of its zeroing methodology in the administrative review at issue in this case that was recently upheld

by the appellate court in *Union Steel*, *supra*, and numerous decisions of this court.  *E.g.*, *Thai Plastic*

*Bags Industries Co., Ltd. v. United States*, 37 CIT ___, Slip Op. 13-21 (Mar. 19, 2013);  *Fischer S.A.*

*v. United States*, 36 CIT ___, 885 F. Supp. 2d 1366 (2012);  *Camau Frozen Seafood Processing*

*Import Export Corp. v. United States*, 36 CIT ___, 880 F. Supp. 2d 1348 (2012); *Far Eastern New*

*Century Corp. v. United States*, 36 CIT ___, 867 F. Supp. 2d 1309 (2012); *Grobest II*, *supra*; *Union*

*Steel*, *supra*.  These decisions hold that Commerce has reasonably explained why it may use a

methodology offsetting positive and negative dumping margins in the context of investigations using

average-to-average comparisons, while continuing to employ zeroing in administrative reviews using

average-to-transaction comparisons, such as the one in this case.  Commerce similarly explained in

the *Final Results* that employing offsets when using an average-to-average comparison methodology

"allows for a reasonable examination of pricing behavior, on average," whereas employing zeroing

when making average-to-transaction comparisons is appropriate because Commerce is examining

"the pricing behavior of an exporter or producer with respect to individual export transactions." *I&D*

*Memo* at 33.

          Contrary to the contentions raised by Vinh Hoan, QVD, and Anvifish, 19 U.S.C

§1677f-1(d) provides for different comparison methods, and Commerce has analyzed the differences

between these distinct methodologies to determine that different interpretations of 19 U.S.C.

§1677(35) reasonably account for the inherent differences between the distinct methodologies.  In

addition, the Federal Circuit in *Union Steel* recognized that Commerce's explanation should not be

scrutinized in fragments, holding that Commerce's rationale of making a limited change in certain

investigations for purposes of implementing a World Trade Organization ("WTO") finding

"[c]ertainly . . . is relevant when considered in conjunction with the other explanations offered by

Commerce."  713 F.3d at 1109-10; *see also Union Steel*, 36 CIT at ___, 823 F. Supp. 2d at 1357-58

(WTO compliance was valid part of total rationale for Commerce's choice).

In sum, Commerce in the *Final Results* explained the differences between the

statutory comparison methodologies and why the differences justified its reasonable interpretation

of 19 U.S.C. §1677(35).  Commerce's application of zeroing is thus hereby sustained.

D.  Anvifish's Arguments re "*Final Modification for Reviews*"

Anvifish avers that Commerce abused its discretion when it declined to apply its

notice of *Final Modification for Reviews*[21] to the subject review.  Anvifish Br. at 17-19. In that

notice, Commerce announced, pursuant to section 123 of the Uruguay Round Agreements Act, that

it would cease to apply zeroing in reviews "pending before [Commerce] for which the preliminary

results are issued after April 16, 2012."  77 Fed. Reg. at 8113.  In the underlying review, Commerce

published the *Preliminary Results* in September 2011, *i.e.*, seven months prior to the deadline

established in the *Final Modification for Reviews*. 76 Fed. Reg. 55872.  This court has recognized

that Commerce has "no legal authority" to apply a section 123 determination "in a manner that

ignores the express legal directive set forth therein."  *See Advanced Tech. & Materials Co. v. United*

---

[21] *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8101 (Feb. 14, 2012).

*States*, 35 CIT ___, Slip Op. 11-105 at 16 (Aug. 18, 2011); *see also Corus Staal BV v. United States*, 32 CIT 1480, 1492-93, 593 F. Supp. 2d 1373, 1384-85 (2008) (holding that a section 123 determination is limited to its express terms).   Thus, contrary to Anvifish's claim, Commerce properly declined to apply the *Final Modification for Reviews* to the *Final Results*.

Anvifish also alleges that Commerce failed to calculate Anvifish's margin as accurately as possible.   As the basis for its claim, Anvifish contends that QVD's weighted average dumping margin, the rate upon which Anvifish's separate rate was calculated, would have been zero in the absence of zeroing.   *See* Anvifish Br. at 17.   Anvifish also points to the zero margins calculated in the subsequent administrative review of the antidumping order as support for its allegation.   *Id.* at 17-18.   However, as noted above, the Federal Circuit recently affirmed Commerce's use of zeroing in administrative reviews, and Anvifish's reliance upon events that occurred in the subsequent review is unpersuasive.   *See U.S. Steel Corp. v. United States*, 33 CIT 984, 1003, 637 F. Supp. 2d 1199, 1218 (2009) ("each agency determination is *sui generis*, involving a unique combination and interaction of many variables, and therefore a prior administrative determination is not legally binding on other reviews before this court."); *accord Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005).   Anvifish does not persuade that its preferred methodology necessarily results in a more "accurate" margin, since for decades zeroing has been held to be a proper philosophical interpretation of U.S. law, and it is only recently that a "mathematical" interpretation has been imposed from without, due to the accretive process of U.S. abdication of its national sovereignty to the vagaries of unaccountable foreign trade "organizations".

*Conclusion*

For the above reasons, the matter must be, and hereby is, remanded for reconsideration and further explanation in accordance with the foregoing.

The results of remand shall be filed with the court by April 20, 2015.  Within seven days thereafter, the parties shall confer and the plaintiffs shall file a joint proposed scheduling order for comments, if any, thereon.

**So ordered**.

Dated:  December 18, 2014                          /s/  R. Kenton Musgrave
       New York, New York                        R. Kenton Musgrave, Senior Judge